IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GLAY L. KIMBLE
    Plaintiff                            :

   v.                                     :   CIVIL ACTION NO. DKC-14-835
                                              (Consolidated with DKC-14-1579)

WICOMICO COUNTY DEPARTMENT OF :
  CORRECTION
WICOMICO COUNTY DETENTION      :
  CENTER
OFFICER JARVIS                             :
OFFICER O'DAY
CONMED HEALTHCARE MANAGEMENT:
WARDEN GEORGE KALOROUMAKIS
    Defendants                           :

**MEMORANDUM OPINION**

On March 18, 2014, Plaintiff Glay L. Kimble (hereinafter, "Kimble"), then confined at the Wicomico County Detention Center ("WCDC"),[1] filed a civil rights complaint pursuant to 42 U.S.C. § 1983. The Complaint contains three separate and distinct claims, the first of which became the focus of the instant lawsuit, namely, Kimble's allegation that he was harassed verbally and through hand gestures and identified as a "snitch" by certain WCDC officers.[2] Kimble requested money damages and "some type of declaratory relief." ECF No. 1, p. 3.

Defendants have filed a Motion to Dismiss or, Alternatively, for Summary Judgment under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. Pro. 56. ECF 15. Kimble opposes the Motion. ECF No. 19. No hearing is necessary to resolve the motion. *See* Local Rule 105.6 (D. Md.).

---

[1] Kimble was released from confinement and now lives in North Carolina. *See Kimble v. Archer,* Civil Action No. DKC-14-1216 (D. Md.), ECF No. 16. Any request for injunctive relief with regard to his confinement at WCDC is now moot.

[2] The Wicomico County Department of Correction, the Wicomico County Detention Center and Conmed Healthcare Management were dismissed from this action on March 24, 2014. *See* ECF No. 3. The claim against the healthcare provider was later instituted as a separate civil rights action. *See Kimble v. Autry,* Civil Action No. DKC-14-1216 (D. Md.). On May 22, 2014, Warden Kaloroumakis was added as a party when the case was consolidated with *Kimble v. Kaloroumakis,* Civil Action No. DKC-14-1579 (D. Md.). *See* ECF No. 9.

**Standard of Review**

The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint. *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted). A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff." *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."). This court deems it appropriate to consider the extraneous materials, as they are likely to facilitate disposition of this case. Accordingly, Defendants' motion shall be treated as a motion for summary judgment.

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme

Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). At the same time, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). This case shall be analyzed in light of this standard of review.

**Background**

On December 13, 2013, Kimble was committed to custody of WCDC following his arrest on charges of armed robbery, assault and related offenses. ECF No. 15-3, pp. 11, 26-27.[3] Kimble did not post bond, initially set at $250,000.00. ECF No. 15-3, p. 22; ECF No. 15-4, p. 48. Shortly after arrival at WCDC, Kimble was issued an inmate handbook and signed the Inmate Orientation Acknowledgement. ECF No. 15-3, p. 52; ECF No. 15-5.

---

[3] This Memorandum Opinion references pagination based on this court's electronic case filing docket.

Kimble's problems with WCDC personnel and his fellow detainees began shortly thereafter.[4]  On January 3, 2014, Kimble filed an Inmate Grievance Form alleging that he had asked Officer Jarvis to sharpen his pencil because the person who had previously sharpened his pencil had not done a good job.  ECF No. 15-4, p. 26-27.  Kimble claimed that, in response, Officer Jarvis gave him the middle finger, made "gay gestures" toward Kimble, and claimed to have had sexual relations with Kimble's relative.  *Id.*  In his report, Jarvis stated that Officer Devine provided Kimble with sharpened pencils and Kimble threw them back, insisted that they be sharpened more, and engaged in loud and disruptive behavior.  Jarvis admits that he then broke the points off the pencils and returned them to Kimble, prompting Kimble to curse more.  Officer Jarvis and Office Devine then walked away.  *Id.,* pp. 30-31.

On January 31, 2014, Kimble spoke with Corrections Officer Parks and Sergeant Byrd about his request that he be transferred to another unit.  During that conversation Kimble denied having any problems with any other inmates or feeling threatened.  He was advised to wait for the classification unit to consider his request.  ECF No. 15-4. pp. 64-65.

On February 11, 2014, a fellow detainee requested that Kimble be relocated because "he stirs up a lot of trouble in this pod" and was "strong arming some of these young white boys."  The detainee requested that staff "do something about this guy before someone else gets hurt.  He's the one who showed his pecker to the female guard during count time.  I sleep right next to his cell so I know he did it on purpose."  ECF No. 15-4, p. 63.  There is no indication whether any action was taken as a result of this information.

---

[4] During the five months he was confined at WCDC, Kimble remained a pretrial detainee.  This distinction is not material, however, because the constitutional protections afforded a pretrial detainee as provided by the Fourteenth Amendment are co-extensive with those provided to convicted prisoners by the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992).  As a practical matter, the Fourth Circuit does not distinguish between the Eighth and Fourteenth Amendments in the context of a pretrial detainee's civil rights claim, *see Hill v. Nicodemus,* 979 F.2d 987, 990-92 (4th Cir. 1992).

On February 17, 2014, Kimble filed an Inmate Grievance Form alleging that he was not getting a response from medical personnel. ECF No. 1-5, p. 21. Several days later, on February 20, 2014, Kimble filed another Inmate Grievance Form complaining that the medical department had not obtained his medical records from the "Georgia Diagnostic Classification Center" and that he had not yet been seen by a mental health professional.[5] *Id.,* pp. 22-23.

On February 25, 2014, Kimble filed an Inmate Grievance Form alleging that he was "standing at the window in C-Pod Clock, looking at Officer O'Day write an infraction on a fight that happen [sic] on F-Pod. One of the officers said something about me looking and he stuck his middle finger at me and told I should not have been standing over his shoulder." ECF No. 15-5, p. 17. Kimble stated that he felt he was being "retaliated against for writing grievance," and acknowledged that O'Day had apologized for the incident, but that if he let the incident slide the officer "will continue to get away with inappropriate behavior." He requested transfer to another facility and indicated that he would continue to "write up" WCDC officers. *Id.,* p. 18.

O'Day prepared an Incident Report regarding the incident, stating that when he learned Kimble was reading over his shoulder he raised his hand and waived for Kimble to go away, Kimble accused him of giving him the middle finger. O'Day explained that he did not disrespect Kimble and that if Kimble took his actions to be disrespectful, that he was sorry. *Id.,* p. 19. As a result of the incident, O'Day was advised not to use physical gestures towards inmates that could be misinterpreted. *Id.,* p. 20.

On February 26, 2014, Kimble wrote to Kaloroumakis, stating that WCDC officers did not like him and asking for a transfer to the "Snow Hill Detention Center, which happens to be

---

[5] The issue of Kimble's mental health treatment while detained at WCDC and his capacity to litigate in this court have been separately addressed. *See Kimble v. Autry,* Civil Action No. DKC-14-1216 (D. Md.).

closer" to his children.  Kaloroumakis initially denied Kimble's request (ECF No. 15-4, p. 55), but later approved the transfer.  ECF No. 15-9. ¶ 8.

On March 10, 2014, Kimble filed two Inmate Grievance Forms.  The first grievance alleged that "Nurse Michelle" had a nasty attitude and was otherwise unprofessional.  ECF No. 15-5, p. 12.  The second grievance alleged that he was not receiving the correct medications.  *Id.,* p. 14.

On March 20, 2014, Kimble was transferred to the Worcester County Jail.  ECF No. 15-3, p. 4.  Within three weeks of Kimble's transfer, Kimble filed several grievances against Worcester County Jail staff and had committed rule violations that resulted in disciplinary action.  ECF No. 15-4, pp. 28-34, 37, 42.  As a result, Kimble was returned to WCDC on April 15, 2014.  ECF No. 15-9, ¶ 10.

Shortly after his return to WCDC, on April 30, 2104, Kimble filed an Inmate Grievance Form alleging that "Nurse Megan" refused to listen to his complaints. ECF No. 15-5, p. 6.  On May 1, 2014, Kimble filed an Inmate Grievance Form alleging that kitchen staff was cooking scrapple and other food in the deep fryer; that pancakes were being cooked in advance and other unsanitary conditions in the kitchen at the Detention Center.  *Id.,* p. 1.  Kimble was released from detention on May 12, 2014.

## Analysis

Kimble's claim against Warden Kaloroumakis is not well defined, but appears based on his role as the chief administrator of WCDC.  Under § 1983, liability is imposed on "any person who shall subject, or cause to be subjected, any person . . . to the deprivation of any rights...." 42 U.S.C. § 1983.  The statute requires a showing of *personal* fault, whether based upon the defendant's own conduct or another's conduct in executing the defendant's policies or customs.

*See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *West v. Atkins*, 815 F.2d 993, 996 (4th Cir.1987), rev'd on other grounds, 487 U.S. 42 (1988) (no allegation of personal involvement relevant to the claimed deprivation); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977) (in order for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights ...") (quoting *Bennett v. Gravelle*, 323 F.Supp. 203, 214 (D.Md.1971), *aff'd*, 451 F.2d 1011 (4th Cir.1971)). Moreover, an individual cannot be held liable under 42 U.S.C. § 1983 under a theory of respondeat superior. *See Monell*, 436 U.S. at 690; *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).

Instead, liability of supervisory officials such as Warden Kaloroumakis in § 1983 claims "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001), citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Such a showing has not been suggested here with regard to any misconduct attributed to Defendants Jarvis or O'Day. Kimble does not indicate that Warden Kaloroumakis played any role in labeling him a snitch. At most, he indicates that Kaloroumakis ordered his transfer to the Worcester County Jail so that Kimble could testify in a criminal matter.[6] *See* ECF No. 1, *Kimble v. Kaloroumakis,* Civil Action No. DKC-14-1579 (D. Md.) at ECF No. 1.

Based on Kaloroumakis' affidavit, it appears that Kaloroumakis ordered Kimble's transfer to appease Kimble's family members, who expressed concern that Kimble might suffer retaliation from WCDC staff. Within three weeks of Kimble's transfer, Kimble filed several grievances against Worcester County Jail staff and had committed rule violations that resulted in disciplinary action. As a result, Kimble was returned to WCDC on April 15, 2014, where he remained until his release on May 12, 2014. ECF No. 15-9, pp. 2-3. Defendant Kaloroumakis' actions do not constitute a violation of Kimble's civil rights, and he is entitled to summary judgment.

This determination, however, does not end the court's inquiry with regard to Officers Jarvis and O'Day. O'Day, at most, made a rude gesture to Kimble, cursed, and shooed him away. This type of action states no constitutional claim. *See Collins v. Cundy,* 03 F.2d 825, 827 (10th Cir. 1979) (sheriff laughed at inmate and threatened to hang him); *Fisher v. Woodson,* F.Supp. 970, 973 (E. D. Va. 1973) (threatening language and gestures of officer are not constitutional violations). Similarly, Jarvis' alleged misconduct in directing racial slurs and sexual innuendos toward Kimble and breaking the points off his pencils does not amount to

---

[6] Kimble apparently testified as a witness in a criminal trial. He now states he "had to come up with something to get transfer[r]ed" and "wrote the state's attorney about information I had about a[n] inmate on my pod and agreed to testify [against] that ind[i]vidual and got move[d] to Snow Hill Jail." ECF No. 19, p. 3. Kimble complains that after release from confinement he had to quit a job and "relocate to North Carolina because of threats, and being called a snitch." *Id.,* p. 1. To the extent that any of Kimble's actions led to his being labeled a "snitch," such labeling cannot be attributed to any action or influence on the part of the named Defendants.

violations of constitutional dimension.  *See Austin v. Terhune*, 367 F.3d 1167, 1171-72 (9th Cir. 2004) (Eighth Amendment protections does not extend to verbal sexual harassment); *Partee v. Cook County Sheriffs' Office,* 863 F.Supp. 778, 781 (N. D. Ill. 1994) (verbal threats, racial epithets, and continued harassment do not meet objective component of Eighth Amendment claim).

Kimble claims that Jarvis labeled him a snitch and provided that information to other detainees, resulting in Kimble having to fight to protect himself.  Taken at face value, this claim can be construed as a failure to protect.[7]  Jarvis has raised an affirmative defense, claiming that the Complaint allegations must be dismissed in their entirety due to Kimble's failure to exhaust administrative remedies.  The Prison Litigation Reform Act ("PLRA") contains a statutory provision that reads, in pertinent part:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.  Kimble while detained was subject to the strict requirements of the exhaustion provisions, and it is of no consequence that he was aggrieved by single occurrences, as opposed to a general conditions of confinement claim.  *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).  Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure, *see Booth v. Churner*, 532 U.S. 731, 741 (2001), and a claim which has not

---

[7] To support such a claim, a detainee must show, first, that the harm he suffered was objectively serious, and second, that prison officials acted with deliberate indifference.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

been exhausted may not be considered by this Court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this Court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See id.* 478 F.3d at 1225; *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir.2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies in accordance with the applicable procedural rules, so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir.2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008). Thus, Kimble's sole remaining claim – that Jarvis labeled him a snitch - must be dismissed, unless Kimble can show that he, personally, has satisfied the administrative exhaustion requirement under the PLRA or that Jarvis has forfeited the right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 286 F. Supp. 2d at 530; *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative

rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Kimble was aware of the WCDC administrative grievance process; he received a copy of the inmate handbook and on several occasions filed grievances against WCDC staff, including Jarvis, whom he accused of breaking his pencil tips and making racist and sexually inappropriate remarks. Kimble did not, however, indicate that Jarvis labelled him a snitch. This allegation was not exhausted through the WCDC grievance process, and shall not proceed here.

For these reasons, a separate order shall be entered granting Defendants' Motion for Summary Judgment.

  November 18, 2014                             _____/s/_____
                                                DEBORAH K. CHASANOW
                                                United States District Judge